## ALABAMA & VICKSBURG RAILWAY COMPANY v. RAILROAD COMMISSION OF MISSISSIPPI.*

1. RAILROADS. *Rebilling rate. Definition.*
    A true rebilling rate is one in which goods received in unbroken car-load lots over one line of railway can be rebilled over the same or another line, completing one continuous trip, simply changing the consignee, and altering the destination of the identical shipment, without unloading.

2. SAME. *Example of what is not.*
    A so-called "rebilling rate" adopted by a railroad, which is not applied to consignments arriving over all connecting lines, but is only available to those receiving freight over an associate line, and under which freight reconsigned over the rebilling road does not complete one continuous trip without rehandling, and is not necessarily the identical shipment originally consigned, there being a custom of granting dealers handling freight over the associate line the privilege within ninety days from the date of their "expense bills," or receipts showing the amount of freight received over such line, of shipping an equal amount

---

*This case has been appealed to, and is pending when this volume goes to press in, the supreme court of the United States.

of freight over the rebilling line at the rate adopted, is not a true rebilling rate.

3. SAME. *Railroad commission. Rate in absence of record order.*

In the absence of record proof showing any official action by the railroad commission, the putting in force of the rebilling rate will be held a voluntary act of complainant railroad.

4. SAME. *Unjust discrimination.*

The condition, prerequisite to the enjoyment of the rebilling rate, that a shipper at the western terminus should first receive freight over the associate road, was unjust discrimination against the dealer at the eastern terminus, who would have no means of disposing of freight consigned to him at the western terminus over the associate line, and hence could not accumulate the "expense bills" demanded.

5. SAME. *Essentials of a rebilling rate.*

A "rebilling rate," to receive the sanction of law, must operate uniformly and fairly, and cannot lawfully be restricted to shippers in a certain locality who previously receive freights over a certain other favored associate carrier.

6. SAME. *Code 1892, § 4297. Powers of the commission.*

Under Code 1892, § 4297, authorizing the railroad commission to determine all complaints made of any tariff of rates adopted by any railroad, or fixed or approved by the commission, on the ground that the charges are unjust or discriminatory, and providing that when, by investigation, the commission is satisfied of the justice of the complaint, it shall give notice of any change deemed proper, and require compliance with the order, the commission has power to abolish a condition precedent to the enjoyment of a so-called "rebilling rate," voluntarily established by a railroad, restricting the rate to the exclusive benefit of those who had received previous and equal shipments of grain over an associate line connecting at one terminus of the road, and to convert the rate into an open or flat rate, so that all dealers handling grain in car-load lots could enjoy the rate then in force between the termini.

7. SAME. *Special unremunerative rate. Free to all.*

Where a railroad voluntarily establishes as to a certain favored class of shippers a rate so low as to be unremunerative, the rate must nevertheless be granted to all alike.

FROM the chancery court of, first district, Hinds county.
HON. ROBERT B. MAYES, Chancellor.

The Alabama & Vicksburg Railway Company, the appellant, was complainant in the court below; the railroad commission of Mississippi was defendant there. From a decree in defendant's favor the complainant appealed to the supreme court. The facts are sufficiently stated in the opinion of the court.

*McWillie & Thompson,* for the appellant.

First—It is claimed that the only question before the court is one of the correction of discrimination under Code 1892, § 4287, and not one of rate making under sec. 4290, and on this theory the important questions presented by the record are sought to be evaded. On this subject we beg to submit a few reflections, first quoting the order of the commission, as follows:

"That the Alabama & Vicksburg Railway Company is hereby ordered to put into effect over its line from Vicksburg, Mississippi, to Meridian, Mississippi, inclusive of both cities, from and after December 8, 1903, a flat rate of $3\frac{1}{2}$ cents per 100 pounds on grain and grain products, and no more."

The order is, by its terms, one fixing a rate, and we do not see how any authority can assert the right to look beyond its form. The object of the commission, save as expressed in the order, is wholly immaterial, and no intimation that it had any ulterior object would be proper. If the purpose of the commission was not to make a rate, but merely to correct a discriminatory feature of an existing rate which gave an advantage to Vicksburg dealers, why did it not direct simply that the appellant should no longer allow to those dealers the re-billing rate on expense bills for ninety days after payment? Certainly no flat rate of $3\frac{1}{2}$ cents per hundredweight was in force prior to the making of the order. In point of fact, apart from the making of a local rate, the commission was without authority in the premises, for the rebilling rate was part of the cost of carriage of a commodity that remained the subject of interstate commerce until it reached Meridian; and the

correction of any discriminatory feature in its operation was confined to the interstate commerce commission. The commission did not assume to do anything except make a domestic rate from Vicksburg to Meridian, and why the validity of that rate may not now be inquired into passes conjecture.

Second—We insist that if the English language is an adequate vehicle for the communication of thought, the order of the commission is one which fixes a rate; and, so treating it, we respectfully insist that the order should be declared invalid, for the reason that the commission has no power to fix rates except such as it derives from Code 1892, § 4290, which, inasmuch as it requires the commission in fixing rates to take into consideration the entire business and earnings of the railroads, both state and interstate, is violative of the interstate commerce clause of the federal constitution and absolutely void. *Smythe* v. *Ames,* 169 U. S., 466; *Nor. Pac. R. Co.* v. *Keys,* 91 Fed. Rep., 47.

This cannot be properly answered by saying that the appellant itself voluntarily fixed the rate, for several reasons. In the first place, as the federal supreme court has declared, "What the company may choose voluntarily to do furnishes no criterion for the measurement of the power of a legislature. Persons may voluntarily contract to do what no legislature would have the right to compel them to do. Nor does it furnish a standard by which to measure the reasonableness of the matter exacted by the legislature." *Lake Shore, etc., R. Co.* v. *Smith,* 173 U. S., 697.

In the second place, such a response would be contrary to the fact. The rebilling rate agreed to was not a domestic rate, but applied only to shipments that reached Vicksburg over the Vicksburg, Shreveport & Pacific and the Alabama & Vicksburg lines. Unless, therefore, the rate ordered by the commission is also not a domestic rate and relates only to shipments received over the lines mentioned, it is not the same rate. We are not called upon to consider whether or not the rate put

in by the appellant, with the sanction of the commission and by agreement between itself and the warring delegations from Vicksburg and Meridian, was valid or invalid, for it is not assailed. That it should not be assailed by shippers on the ground that it limited the rebilling rate to shipments reaching Vicksburg over the Vicksburg, Shreveport & Pacific and the Alabama & Vicksburg lines is quite natural, since the interstate rate to Vicksburg was the same on all the railroads, and it made no difference to them over which line the grain came; and the Yazoo & Mississippi Valley Railroad Company, the only other line entering Vicksburg, has never complained. Moreover, it is not seen by what authority the commission can undertake the correction of abuses touching the operation of interstate rates. The rebilling rate was a part of an interstate rate, and if made the means of discrimination, resort should have been had to the interstate commerce commission.

The rate is also distinguished from the one to which the appellant consented by the fact that only on the rebilling rate can the appellant secure empty freight cars and save the cost of hauling empty equipment in which to handle the business, and this was an important consideration to induce appellant's acquiescence in a rate so low. The judgment of railway managers as to what is of advantage to their companies should not be ignored, and the plain, reasonable, and uncontradicted evidence on this subject should not be dismissed from consideration. We respectfully call attention to the testimony of Messrs. Harvey and Steele on this subject.

Still another difference is to be found in the clearly proved fact that the appellant on the rebilling rate received from its western connections a part of the interstate rate to Vicksburg. There is no reason why the appellant should have been burdened with showing that it could not secure the same advantage from the Yazoo & Mississippi Valley Railroad Company, the fact that it did have it from the Vicksburg, Shreveport & Pacific line being sufficient to make the difference be-

tween the rebilling rate to which it assented and the flat rate ordered by the commission.

The chancellor did not apparently question the binding authority of the decisions cited, but brushed them aside upon a misconception of the case before him, declining to pass upon the constitutionality of the statute. He erroneously says in his opinion that the answer of the commission shows that they did not consider the interstate earnings, and, there being nothing to disprove their assertion, it must be accepted as true. It will be observed that the answer distinctly states that the law was followed and that the commission "did take into consideration the entire business of the complainant and its earnings from all kinds of tariff," including necessarily the interstate business and earnings. No weight can be attached to the added statement that while the commission improperly considered the interstate business and earnings of the company they were not influenced thereby in fixing the rate in question. That is on a par with the declaration of a juror after verdict that incompetent evidence allowed to go to the jury did not affect his verdict, and should receive as scant respect.

The case of the railroad commission would not be in the least helped, however, by the admission that they did not take into consideration in fixing this local rate the interstate business and earnings of the company; for sec. 4290 of the code requires them to do so, and they have no power to fix rates at all except in the manner provided by that section. If they failed to comply with the state law by not considering such business and earnings, their act cannot be sustained without reference to the federal constitution; and if they considered such business and earnings, they have violated the federal constitution under cover of a void state law.

Third—The effect of the order of the commission as a regulation of interstate commerce is clear, for there is such a disproportion between the earnings of the domestic and those of the interstate traffic that any additional burden must come

out of the profits derived from the latter. The only answer offered to the clear, conclusive, and wholly uncontradicted testimony on this subject is founded upon the fact that the witnesses were unable to state from the books of appellant the exact proportion of expenses attributable to each kind of traffic, domestic and interstate. When the same railway train carries both interstate and domestic shipments, it is readily seen that there is no way of reaching an exact apportionment of the cost of carriage between the two kinds of traffic, but this does not prevent a reliable estimate by experts, entirely familiar with the business of the particular railroad, nor affect the value of their conclusion that no net profit is derived from the domestic business. It will not do to reject such an estimate founded upon ascertained data in relation to a subsidiary matter while allowing juries to act directly upon estimates as to the value of crops destroyed before maturity and other matters not within the positive knowledge of any one.

Fourth—It is perfectly evident that if the Meridian dealers avail of the rate ordered they must do so by applying it to commodities which never lose their character as the subjects of interstate commerce until they reach Meridian. An examination of the evidence and of the petition on which the commission made the order, together with the argument filed in support of it giving the reasons for the application, will show that the whole object of the petition and the order based thereon was to fix a rate on grain that would reach Vicksburg from other states and stop at that point only temporarily in transit. Vicksburg, according to the evidence, is not a grain-producing point, and all the grain shipped from that city is first brought there from other states. It will also be noticed that the Meridian dealers complain that to make as full use of the rebilling rate as the Vicksburg dealers they would have to make use of warehouses in that city, which they are wholly unwilling to do, and which the chancellor

86 Miss.—43

regarded as an intolerable burden upon them, and it is thus made entirely plain that it has never been intended that the grain shall stop in Vicksburg except for a limited time in transit while it was being transferred from the barges to the freight cars preparatory to its being forwarded to Meridian. *Whether or not an article is still the subject of interstate commerce after reaching one point in a state and before its carriage to another point therein depends upon whether or not it is at rest at the first point for an indefinite period.* This is the true test, and certainly it cannot be pretended that grain brought from other states to Vicksburg to be forwarded to Meridian on orders of dealers of the latter city who decline to have warehouses in Vicksburg is to be regarded as at rest in Vicksburg for an indefinite period. They cannot under the law expect to use either barges or freight cars as warehouses and could contemplate nothing else but prompt shipments to Meridian. *Kelley* v. *Rhodes,* 188 U. S., 1; *Diamond Match Co.* v. *Ontonagon,* 188 U. S., 82, 93–96; *Pittsburg, etc., Co.* v. *Bates,* 156 U. S., 577.

The grain arriving at Vicksburg would not remain there for an indefinite period, but while it might have been billed originally to Vicksburg, would promptly proceed on a continuous journey from St. Louis or other points without this state to Meridian.

The case of *Budd* v. *New York,* 143 U. S., 517, does not conflict with the foregoing, for an examination of the decision will show that the order fixing the rate of a floating grain elevator in New York harbor was sustained on the theory that it was a mere wharfage charge.

Fifth—The appellant showed by evidence as clear and satisfactory as the subject admits of that the rate ordered is a confiscatory one. It was shown in plain figures that the cost of hauling a train load of grain at $3\frac{1}{2}$ cents per hundredweight from Vicksburg to Meridian would exceed the freight charges. The chancellor, in his opinion, found this as a matter of

fact on the testimony of Mr. Harvey. No other conclusion could have been reached on the evidence. The witness based his calculations on the earnings and expenses per freight train load and estimated the cost on a freight train load of 362 tons from Vicksburg to Jackson, and 380 tons from Jackson to Meridian, the nature of the grades necessitating a less load from Vicksburg to Jackson than for the balance of the haul, both of which statements of tonnage, it will be observed, largely exceed the average train load of 239.09 tons. He might well have based his calculation on the smaller tonnage of freight trains from Vicksburg to Jackson, which would have been more favorable to his contention, since no train going from Vicksburg to Meridian could transport to Meridian any load that it could not carry to Jackson, but took the smaller tonnage from Jackson to Meridian into consideration and ascertained the tonnage for the whole distance by apportionment. The distance of Jackson from Vicksburg being about one-third of the 140 miles to Meridian, he deducted from the 380 tons 6 tons, or one-third of the 18 tons constituting the difference between the 380 tons from Jackson to Meridian and the 362 tons from Vicksburg to Jackson, leaving 374 tons, which at 3½ cents per 100 pounds, or 70 cents per ton, gives his figure of $261.80 per train load, which is less by $42.84 than the cost of hauling any loaded freight train for that distance. This calculation took into consideration neither the cost of returning empty cars nor fixed charges, nor any dividends to stockholders.

It has often been held that mathematical certainty is not required to establish a fact like the one under consideration, but we submit that in this case Mr. Harvey's testimony amounts to a mathematical demonstration.

His testimony does not stand alone, however. A number of persons connected with the traffic departments of other railroads, persons whose testimony shows that they are entitled to be classed as experts, declare with equal clearness that the rate could not be put in force without actual loss. See the testimony

of Messrs. Green, Compton, Cameron, and Miller.   That the testimony of experts is valuable in this connection is well settled.   On this subject the supreme court of the United States has held that:

"The opinion of experts, familiar with railroad business, is competent testimony and cannot be disregarded." *Minneapolis, etc., R. Co.* v. *Tompkins,* 176 U. S., 167.

This evidence shows that the railway company cannot carry the commodity at the rate mentioned without incurring loss, and is quite apart from the other testimony, amply sufficient to sustain the charge of unreasonableness, that no such low rate prevails on the same line on any other commodity for an equal distance, or on the same commodity for any less distance, however short, or on the same commodity on any other line for an equal distance, and that the rate is lower than that on the same commodity on lines having to compete with carriage by water, which affords the lowest rate of known transportation.

It would answer all the ends of our argument to show that the rate does not allow adequate compensation—or, in other words, is unreasonably low—but we insist that the evidence fully sustains our position that the rate would yield no remuneration whatever, and, if enforced, must cause an actual loss to the appellant.   This court will surely give no heed to the specious, but wholly unsound, argument of the appellee that no loss would result, because freight trains are not ordinarily made up wholly of cars loaded with grain, but, in part, of cars loaded with other commodities that bear a higher rate.   The answer to this is that we are not considering in this case the higher rate that is allowed on other commodities by reason of the difficulty of handling them and of their value, liability to damage, and other characteristics, but merely the rate on grain, and there is no reason why the returns from hauling such other freights which have been already approved by the commission should bear the loss on grain.   Certainly the higher rate allowed on other commodities does not make the rate on grain

any higher, and the only proper way of determining whether the rate on grain is remunerative or not is to take the case of a train load of that commodity. By the process of reasoning on which the appellee advances this contention it would be equally proper to require grain to be carried for nothing because other freights carried by the same train gave reasonable returns.

Giving to the testimony the effect attached to it by the chancellor as showing that the rate could not be put in operation without actual loss to the company, we invite attention to the conclusion of law he expressed upon this state of facts. As will be seen, the chancellor held that where the entire business of a railroad shows a profit a railroad commission may establish a rate on a particular article of freight which is below the cost of haul, provided that in so doing a margin of profit is left on the entire business. This conclusion offends our statute as well as the federal and state constitutions. If we have not very greatly misconceived the purpose of our statute, every rate must to a great extent be graded upon its own merits, and not merely as an integral part of all the business of the company. Code 1892, § 4290, provides that:

"In revising, fixing, and regulating charges for transportation, the commission shall take into consideration the character and nature of the service to be rendered, . . . and shall so revise, fix, and regulate the charges as to allow reasonable compensation for the services to be rendered."

Why should the character and nature of the particular service be considered but as a measure for determining the amount of compensation to be paid therefor, and can a rate of compensation below the cost involved in the rendition of the particular service be a reasonable charge? The right to ship below cost of carriage is in principle the same as the right to ship free of all charge, and we do not see how the sanction of the commission could strengthen such a demand. The legislature intended to empower the commission to make rates with a view

to their equalization on the various subjects of transportation according to the character and nature of the particular service involved—that is to say, a less charge should be allowed on articles easily handled and transported in large quantities and without risk of loss or damage than should be allowed on those of the opposite character—but no lawmaker ever dreamed of authorizing the commission to arbitrarily favor shippers of particular commodities and to select what articles should bear the burdens of transportation and what should go free or below cost of carriage. The lowering of the rates on particular commodities below cost of carriage involves a corresponding increase of rates on other commodities in order to maintain a reasonable profit, unless the rates on such other commodities are unreasonably high, in which case they are the rates that should be changed by reduction. A rational distribution of the cost of carriage among all the subjects of transportation on the principle of average, not losing sight of "the character and nature of the service rendered" in each case, is the only means of attaining the equality contemplated by the scheme pervading our code chapter on supervision. No commodities can be relieved from contributing their proportional part of the profit allowed in this state without permitting unreasonably high rates on other commodities, since the railroads are not allowed to earn more than a reasonable profit on their business as a whole. If the theory of the chancellor were fully developed and carried out for the benefit of Meridian in respect to the main subjects of transportation, and the rate on grain put down on one line to a point where it yielded no profit, and the rate on the other chief articles of commerce put down in the same way, respectively, on the several other lines operating in that city, each line would soon do all the business of Meridian as to the particular commodity it had to carry for less than the cost of carriage, and all would sustain injury for which no justification can be found. Under the opinion of the chancellor, as long as the company might derive any profit

from its whole business, however unreasonably small, the commission would be authorized to take up the several subjects of transportation and reduce the rates thereon below cost of carriage, which is against authority as well as reason. *Sou. Pac. R. Co.* v. *Comm'rs,* 78 Fed. Rep., 261.

The question seems to have been definitely settled by this court several years since. A suit. was brought by the railroad commission against a telegraph company under Code 1892, §§ 4328, 4329, to recover the. statutory penalty incurred by the company by reason of its having discontinued its office at Fayette after the commission had refused to give its consent to the abandonment of the office. The company pleaded, among other things, that the receipts of the office were insufficient to pay the expense of keeping it open for business, and that if maintained it would necessarily be at a loss to the company. This plea was held to be good on demurrer, the court saying, in its opinion, that the facts set up furnished "ample justification for the appellant in closing its office at Fayette." *W. U. Tel. Co.* v. *Railroad Com.,* 74 Miss., 80.

The chancellor based his view of the law of this question on two cases; for the case decided by the supreme court of Minnesota, reported in 89 Am. St. Rep., is the same case which was decided on appeal to the supreme court of the United States and reported under the title of *Minneapolis, etc., R. Co.* v. *Minnesota Railroad and Warehouse Commission,* in 186 U. S., 257. The other case cited is that of *Pensacola, etc., R. Co.* v. *State,* 25 Florida, 310, also reported in 5 South. Rep., 833.

As to the Florida case, the court will observe that the subject received but scant consideration, only a very few lines being devoted to it near the end of a long, rambling opinion on other subjects, in which the author, before reaching this one, makes use of the following language:

"We have found no case which holds that a railroad company can be compelled to carry at unremunerative rates." 5 South. Rep., 842.

The court was there considering a suit to recover a penalty for charging a greater fare to a passenger than was allowed by the statute regulating the subject, and was by no means considering a freight rate fixed by a commission at a figure that involved actual loss to the railroad company. There was presented to the court no such question as that arising upon the language of our statute, which requires all charges to be reasonable and to be fixed with reference to the character and nature of the service rendered in hauling the particular article. If we give to this case the effect claimed for it, the decision becomes an eccentric one, against reason and the weight of authority.

The Minnesota case, reported in 186 U. S., 257, does not support the conclusion of the chancellor. In that case there was a failure of proof, the court employing the following language in reference thereto:

"This rate, fixed by the commission only upon hard coal in car-load lots, was not met by any showing that at the rates fixed by the commission there would be no profit or an insufficient profit upon the coal so transported. . . .

"The difficulty with the defendant's case is that it made no attempt to show the cost of carrying coal in car-load lots." 186 U. S., 265, 266.

There were two objections made to the evidence in the Minnesota case. One was that it was confined to an attempt to prove that if the rate on coal were applied to all freight the road would not pay its operating expenses. The propriety of this the court thought was at least doubtful. The other objection was that in the operating expenses were included interest upon the bonded debt of the road and dividends, which the court thought plainly improper. *Ib.,* 266. The court declared, too, that the evidence showed the rate fixed for coal was above the average rate, although coal was classified as far below the average. *Ib.,* 266.

In connection with its rulings on these objections, the court said:

"We do not intend, however, to intimate that the road is not entitled to something more than operative expenses." *Ib.,* 266.

None of the above objections are applicable to the evidence in this case. In this case there was an attempt, and a successful attempt, to show the cost of carriage, and the showing that it exceeded the compensation allowed under the proposed rate only took into consideration the actual expenses of operation. It is, moreover, quite evident that the court in the case mentioned was not in the least degree considering the case of a rate below cost of carriage, but merely a rate alleged to be, and not proved to be, unreasonably low when compared with rates on other freights.

It is true that Mr. Justice Brown said in the case:

"It sometimes happens that, for purposes of ultimate profit and of building up a future trade, railways carry both freight and passengers at a positive loss." *Ib.,* 268.

But it will be seen that he immediately proceeds to say:

"It may not be within the power of the commission to compel such a tariff." *Ib.,* 268.

It is evident that the learned judge had in mind another decision which proceeded from the bench on which he sat, to the effect that the "voluntary" action of a carrier in fixing a low rate is no criterion of the power of a state commission to compel it. *Lake Shore, etc., R. Co.* v. *Smith,* 173 U. S., 684.

We deny that there is an instance where any court has gone so far as to hold that a state or any of its instrumentalities has the power and authority to require a railroad to transport any person or article below cost. The chancellor's decision is in the teeth of an opinion by Mr. Justice Brewer, wherein it was held that:

"State railroad commissions cannot enforce a schedule of rates for switching cars in a city which fixes the compensa-

tion at less than the actual cost to the railroad company for the work." *Chicago, etc., R. Co.* v. *Becker,* 35 Fed. Rep., 883.

Similarly it has been held that it was a denial of the equal protection of the law for a state to require a railroad company to accept less than its ordinary remuneration on certain traffic, although there might have been a profit in it, the court deciding that it was unconstitutional to select one class of passengers or a class of traffic arbitrarily and prevent the railroad companies from receiving the ordinary compensation which they collected from the rest of the public and from other classes of traffic. *Lake Shore, etc., R. Co.* v. *Smith,* 173 U. S., 684.

So also a state law prescribing local freight rates on railroads which reduces such rates 29½ per cent is invalid where the rates prescribed are such as to companies operating roads within the state and doing an interstate business that there would be no net earning from transportation of freight if such rates were applied to all of the business. *Ames* v. *Union Pac. Ry.* (C. C.), 64 Fed. Rep., 165.

In its opinion in this case the court said:

"If it would be unreasonable to reduce the total earnings of these roads 29½ per cent, it is, *prima facie* at least, equally unreasonable to so reduce any single fractional part of such earnings." *Ib.,* 188.

If a reduction below cost were made on all freights, there could be no profit on either domestic or interstate business. The testimony in this case shows that a reduction of the same percentage on all the business would leave an immense deficit in revenue.

The reduction of the rate on a single commodity to a figure below cost of carriage involves the same principle as an unreasonable reduction of the schedule as a whole, and a railroad commission has no power to fix any charge that will be unreasonable and not furnish proper compensation to the carrier. Under pretense of regulating fares and freights the state cannot require a railroad company to carry persons or property

without reward, neither can it do that which in law amounts to a taking of private property for a public use without just compensation. If the rate either deprives the carrier of all compensation or fails to award it just compensation, it is beyond the power of the commission and illegal. *Railroad Commission Cases,* 116 U. S., 329; *Chicago, etc., Ry. Co.* v. *Dye,* 35 Fed. Rep., 866; *Clyde* v. *Richmond, etc., R. R. Co.,* 57 *Ib.,* 436; *Southern, etc., Ry. Co.* v. *Board, etc.,* 78 *Ib.,* 236; *Pensacola, etc., R. Co.* v. *State,* 25 Fla., 310; *Storrs* v. *Pensacola, etc., R. Co.,* 29 Fla., 617; *Chicago, etc., Ry. Co.* v. *Minnesota,* 134 U. S., 418; *Chicago, etc., Ry. Co.* v. *Becker,* 32 Fed. Rep., 849.

And the reasonableness of the charge is always a question for the courts. *Chicago, etc., Co.* v. *Minnesota,* 134 U. S., 418; *Chicago, etc., R. R. Co.* v. *Railroad Commission,* 42 Am. & Eng. R. R. Cas., 285; *Reagan* v. *Farmers' Loan and Trust Co.,* 154 U. S., 367; *Smythe* v. *Ames,* 169 U. S., 466.

As to the elements of proof that may be considered in determining the reasonableness or unreasonableness of a rate, we beg to cite the following: *Nor. Pac. Ry. Co.* v. *Keys,* 91 Fed. Rep., 47; *Smythe* v. *Ames,* 169 U. S., 466; *Interstate Com. Commission* v. *Southern Ry. Co.,* 137 Fed. Rep., 741.

Sixth—We deny most emphatically on the record in this case that the manner in which the rebilling rate was operated is subject to condemnation as discriminatory. Against whom did it discriminate, and in what way? Surely this court will not condemn it as discriminating against the Yazoo & Mississippi Valley Railroad Company or dealers on its line, while neither that company nor any such dealer is complaining. No dealer, either at Vicksburg or Meridian, was affected by the restriction of the rebilling rate to grain reaching Vicksburg over the Vicksburg, Shreveport & Pacific Railway or Alabama & Vicksburg Railway, for the reason that Vicksburg is not a grain-producing point, and the interstate rate from St. Louis, the producing point from which

comes nearly all the grain that reaches Vicksburg, was the same (12 cents per hundredweight) on all roads. Nor does the fact that the appellant was allowed a portion of the interstate rate of 12 cents to Vicksburg add anything whatever to the expense of the shipper, but simply reduces the compensation of the other roads participating in the interstate rate, which burden they were willing to bear to make the position of the appellant somewhat less intolerable.

The Vicksburg dealers are not complaining, but, on the contrary, are said to be the beneficiaries of the discriminatory conduct, and the Meridian dealers alone are claimed to be injured by it. We deny, as a matter of fact on the record, that they are in even the slightest degree affected, and insist that the court below has been misled by a mere pretense and sham.

We do not deem it necessary to discuss the threadbare proposition that grain can be brought to Vicksburg by barge at a lower rate than by rail. The Vicksburg dealers, who are as much interested as any could be in getting cheap transportation to that city, have abandoned that method in favor of transportation by rail. Mr. Steele, appellant's general freight agent, stated that "there is only an occasional movement of grain from St. Louis to Vicksburg by river, the all-rail rate of 12 cents being so low as to exclude boats from participating in the business, except under unusual and very favorable conditions." Mr. Harvey, appellant's president, showed that, in addition to the river charge, the grain would have to be loaded on the cars at the river and hauled a distance of two miles to Vicksburg, up a very steep grade, at a cost for switching of not less than $3 per car. As a matter of fact, the single item of unloading from barges involves expense to a prohibitory degree. In the Aberdeen group cases it was found by the interstate commerce commission only an occasional tramp boat carried grain to Vicksburg, not one-twenty-fifth of the grain reaching that city being carried by water. 10 Int. Com. Rep., 296, 297.

Dismissing transportation to Vicksburg by barge from further consideration, we ask the court to note that the interstate rate from St. Louis, the point from which nearly all grain proceeds to Vicksburg, on all the railroads, was 12 cents per hundredweight, and that Meridian had an interstate rate of 14 cents per 100 weight from St. Louis.

With a 14-cent interstate rate in force it is utterly impossible for Meridian dealers to find any advantage in the flat rate of $3\frac{1}{2}$ cents from Vicksburg, for that rate added to the 12-cent interstate rate would make $15\frac{1}{2}$ cents, or $1\frac{1}{2}$ cents more than they are now paying. If Meridian cannot compete with Vicksburg on a 14-cent rate, it is hard to understand how it could do so on a $15\frac{1}{2}$-cent rate. How in the name of reason can Vicksburg employ the rebilling rate in competition with Meridian when it has to pay 12 cents to get the grain to Vicksburg and $3\frac{1}{2}$ cents more to get it to Meridian? For the court will recollect that the $3\frac{1}{2}$-cent rate does not apply to any other town between Vicksburg and Meridian, as to all of which towns the regular local rates apply, the local rates of the station nearest Vicksburg exceeding $3\frac{1}{2}$ cents, and those of other stations increasing with the distance to 10 cents. How could the Vicksburg dealer afford to pay the $15\frac{1}{2}$ cents to Meridian and then ship west to stations on appellant's line, paying in addition the local rate to such stations, when the Meridian dealer could ship to the same station at 14 cents and the local rate? It is immaterial whether the additional local rate is over appellant's line or some other line, for the local rates are about the same on all the lines.

But it is claimed that the Vicksburg dealer can store his grain in warehouses and so fill emergency orders quicker than his Meridian competitor. If there is any reason why the Meridian dealer cannot also keep grain in storage—or why, not doing so, he should insist upon equality with a competitor who does—we are at a loss to discover it. He would have just as much right to complain that another dealer in his own

city had a warehouse and kept grain in storage. That Vicksburg only got such emergency orders as one city may always get from another not greatly removed is shown by the fact that only fifty car loads were shipped to Meridian on the rebilling rate during the year ending June 30, 1903, by both Meridian and Vicksburg dealers. The reticence of the Meridian dealers under cross-examination as to the extent to which they had availed of the rebilling rate suggests that they were themselves the shippers of nearly all of the fifty car loads.

It is further contended that the Vicksburg dealer could sell cheaper in Laurel and Hattiesburg than the Meridian dealer. Now, if this is so, let us assign the fact to its true cause. It cannot possibly result from the rebilling rate as operated, because after carriage to Meridian at 15½ cents the Vicksburg dealer would still have to pay the local rate of the New Orleans & Northeastern Company, while the Meridian dealer could ship to those points by paying 14 cents and the same local rates. It can only result from the fact that the commission itself, over the protest of the appellant, has put in force a rate of 7 cents per hundredweight from Vicksburg to Hattiesburg and Laurel. If the Vicksburg dealer can sell cheaper in Hattiesburg and Laurel than the Meridian dealer, it is the commission which has enabled him to do so, and it cannot evade responsibility for its action by the impossible theory that it is due to the rebilling rate in question. It is shown that the 7-cent rate to Hattiesburg and Laurel is unreasonably low and unremunerative, but, bad as it is, it remains more bearable than the proposed rate, considering mileage and other conditions. If this is a cheaper rate and is discriminatory in favor of either Vicksburg or Hattiesburg and Laurel and against Meridian, the commission is itself guilty of exactly what it was created to prevent, just as it was in giving Meridian a 3½-cent rate and leaving the Jackson rate at 7 cents. We insist that the commission is not above the law and cannot take advantage of its own wrong, if wrong has been done.

The crumpled rose leaf of which Meridian's mercantile syba-
rites complain is that the Vicksburg dealers have made use
of a rebilling rate equally open to themselves.    They were
forced to acknowledge that this rate was open to them and
that they were using it, but to what extent they were evi-
dently unwilling to divulge, some of them saying curtly that
they did not know or did not remember, and one declined to
say because he would have to refer to his books to see.    Being
cornered as to this, they shift their sails, and say that it is not
the rebilling rate itself that operates against them, but the fact
that the Alabama & Vicksburg Railway Company allows the
rebilling rate on all grain for which expense bills are shown,
and that the Vicksburg dealers who have accumulated expense
bills ship out from their warehouses grain that did not reach
Vicksburg over the Alabama & Vicksburg or the Vicksburg,
Shreveport & Pacific lines.    An expense bill is in substance a
receipt given by a railroad company for freight charges paid,
and it is shown that the Alabama & Vicksburg Company only
gives the rebilling rate where the expense bills are for so much
grain that has come over its line or that of the Vicksburg,
Shreveport & Pacific.    A Vicksburg dealer cannot, any more
than a Meridian dealer, get the rebilling rate on an expense bill
of the Yazoo & Mississippi Valley Railroad; but when he pre-
sents an Alabama & Vicksburg or Vicksburg, Shreveport & Pa-
cific expense bill, he can get the rebilling rate for that much
grain, no matter that it is not the identical grain which came on
the expense bill, and may, in fact, have come over the Yazoo &
Mississippi Valley Railroad.    This results from the fact that after
the grain is put into the warehouse at Vicksburg the Alabama
& Vicksburg Company cannot possibly tell how it came to
Vicksburg, and the Vicksburg dealer might not himself know.
But the result is the same, for no more grain is shipped out by
the Vicksburg dealer over the Alabama & Vicksburg line at
the rebilling rate on expense bills than he received by that line
or the Vicksburg, Shreveport & Pacific.

The record shows that on all expense bills of the Alabama & Vicksburg and Vicksburg, Shreveport & Pacific roads the Meridian dealers can get, and have been getting, the rebilling rate, and that, like the Vicksburg dealers, they can even use such expense bills to get the rebilling rate on grain which was not the identical grain on which the expense was incurred, but other grain substituted for it. The fact is that the advantage of which they complain results to Vicksburg dealers from their maintaining warehouses and employes in Vicksburg, where grain, as well as expense bills, is accumulated, and the testimony of the defendant's own witnesses plainly shows this. The Vicksburg dealer, with grain in his warehouse, can make quicker delivery on orders than the dealer in St. Louis or the Meridian man who orders from St. Louis direct to his customer. If the Meridian man had to bear the expense of maintaining a warehouse and employes in Vicksburg, he would perhaps change his mind as to the advantage of the dealer in that city, but he cannot be heard to complain that he has not those advantages which result to another from his having gone to the expense of securing them. This is the doctrine of this court in the recent demurrage case, where the court held that a railroad was under no duty to put those without warehouses on an equal footing with those who had them, and that no one had the right to use freight cars for warehouse purposes free of charge.

All this may be said without reference to the advantages enjoyed by Vicksburg dealers by reason of their location on the Mississippi river. No court can legally deprive them of that advantage or such as may result from their having provided superior facilities for carrying on their business.

*McClurg & Gardner,* for appellee.

Upon continued, thorough, and full investigation of the whole matter for a year, the appellant and its allies having an open door, the railroad commission found that the complaint

of the Meridian board of trade was well founded, and granted the relief. The finding is *prima facie* correct, and will not be uprooted, except on the strongest showing.

Before the commission it was pleaded:

"1. The rate now in force is not an unreasonable one, and the reduction asked for would make the rate unreasonably low.

"2. The reduction would operate as an unlawful discrimination in favor of Meridian and against other points in the state.

"3. The proposed reduction would be a burden upon and a regulation of interstate commerce."

Before the chancery court the front was materially shifted. In other words, in order to restrain the commission from enforcing an order rightfully made upon the evidence before it, a new and different case was made by the bill of complaint, more compactly stated in the brief of counsel before the court as follows:

"1. It discriminates against localities—indeed, against every station on the complainant's line east of Vicksburg and west of Meridian.

"2. It discriminates against the shippers of other commodities than grain and grain products from Vicksburg to Meridian.

"3. It discriminates against the shippers of native-grown corn from all points on the line.

"4. It discriminates against the complainant as a railway corporation."

The appellant was catechised, and responded promptly and stoutly until the crucial point was reached:

"I. The owners' estimate of the present actual value of said road?

"Ans. There is no way of obtaining this information, nor is there any reliable basis for fixing such value.

86 Miss.—44

"I. The owners' estimate of the value of equipment of said road?

"Ans. There is no way of obtaining this information."

A straightforward, honest answer by the appellant, through its board of directors or otherwise, would have fixed at once the real test for the rate invoked. No court or commission should stultify itself by giving any sort of relief to the appellant until it has purged itself by honest, direct answers to these vital questions. It preferred to evade this direct appeal to the conscience and judgment of its managers and seek refuge in the labyrinth of estimates, average, and figures.

This case, as it comes here, presents a question of *fact* only. The unbroken rule here is not to disturb the verdict of a jury or the judgment of the court upon a question of fact where a jury is waived. The same is true as to the finding of a fact by a chancery court. In short, where this court has been asked to reverse a case upon a question of fact alone, the universal practice has been not to do it, no matter from what court, law or equity, the appeal comes. Even where there is a conflict in the testimony or a doubt as to the correctness of the finding by judge or jury, it will be resolved in favor of the finding, and not reversed. *Davis* v. *Richardson,* 45 Miss., 499; *Robertson* v. *Cloud,* 47 Miss., 208; *Dickson* v. *Cook,* 47 Miss., 220; *Apple* v. *Ganong,* 47 Miss., 189; *Randel* v. *Yates,* 48 Miss., 685; *McAlexander* v. *Puryear,* 48 Miss., 420; *Harrington* v. *Allen,* 48 Miss., 492; *Buckingham* v. *Walker,* 48 Miss., 609; *Wilson* v. *Beuchamp,* 50 Miss., 42; *Porter* v. *Bedford,* 57 Miss., 84; *Valentine* v. *McGrath,* 52 Miss., 112; *Weathersby* v. *Toma,* 57 Miss., 296; *Bank* v. *Moss,* 63 Miss., 74; *Walker* v. *Walker,* 67 Miss., 592; *Railroad* v. *Daggett,* 67 Miss., 250; *Jones* v. *Bank,* 71 Miss., 1023; *Allen* v. *Smith,* 72 Miss., 689.

In the late case of *Stevens* v. *McGee,* 81 Miss., 644 and 649 (1902), this court said: "It is a rule that a chancellor's decision of the facts of a case is to be sustained unless it appears to be manifestly wrong." To the same effect in *Railroad Co.* v.

*Adams, Ib.* p. 90, at p. 107 *et seq.,* the court holds that this court will disregard even a declaration in a decree that the chancellor refused to decide certain points, and to look to the whole record and review the judgment appealed from. So it is immaterial whether the chancellor gave exactly the correct reasons for his decision; the question is, Is the decree right?

As hereinabove stated, if there is a doubt, not as to the correctness of the judgment of the court, but as to the reasonableness of the rate, the court will not reverse the case. 31 'Am. & Eng. R. R. Cas., 76.

The finding of the commission should not be disturbed unless it is clearly shown to be manifestly wrong. *Interst. C. C.* v. *L. & N. R. R.,* 102 Fed. Rep., 709; *Interst. C. C.* v. *Sou. Pac. R. R.,* 123 Fed. Rep., 597.

The testimony in this case sets the case within a hair's breadth of a confession by the appellant that the rate fixed by the commission is reasonable. It denies to the appellant the right to impoverish its general tariffs by a collusive "rebilling rate" or by "expense bills," and then to say that such rate is unreasonable or wholly inadequate for the service rendered. The courts will not be made a party to such subterfuge as that which allows this transportation company to receive grain and grain products at Vicksburg on January 1st and ship it in every direction, and on the 1st of February or March receive on other consignments and forward it, rebilled or "expensed," as being the same shipment received on January 1st. Nor will the court indorse a collusive, oppressive, and unlawfully devised policy, in support of the unreasonable defense here, which allows the appellant to take Vicksburg, Shreveport & Pacific freight consigned to Meridian at 3½ cents and refuse Yazoo & Mississippi Valley and river freight in more direct competition from St. Louis and the west with the Mobile & Ohio, at less than 10 cents per 100 pounds.

The state may enact laws that incidentally affect interstate commerce in the protection of its domestic affairs in matters

pertaining to the comfort, health, safety, convenience, and prosperity of the state. *M., K. & T. R. R. Co.* v. *Haber,* 169 U. S., 613; *Hennington* v. *Georgia,* 165 U. S., 299, 317; *New York, N. H. & H. R. R. Co.* v. *New York,* 165 U. S., 628, 631; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Sloan,* 169 U. S., 311, and authorities cited in each case; *Peik* v. *C. & N. W. R. R. Co.,* 94 U. S., 164 (24 L. ed., 97); *Hall* v. *DeCuir,* 94 U. S., 485 (24 L. ed., 584); *Munn* v. *Illinois,* 94 U. S., 113 (24 L. ed., 77).

"A railroad entirely within the state may or may not be a carrier of interstate commerce. When the freight is taken up or laid down within the state, it is not interstate freight, even though it originated in another state and was intended to be shipped to a foreign country or to another state than that of its origin. To be interstate commerce the freight must have been billed through; the carriage must be continuous." *The Steamer Daniel Ball, supra; U. S.* v. *Lehigh Valley R. R. Co.,* 115 Fed. Rep., 373.

COMPETITION.—"The discrimination in favor of competitive points on account of competition, which compels a reduction of rates to these points below the rates charged for shorter distances, is not an undue or an unjust discrimination prohibited by the act to regulate commerce." Interst. Com. Com., 181 U. S., 1, 29 (45 L. ed., 219, 729).

RATES.—*Union Pac. R. R. Co.* v. *Goodrich,* 149 U. S., 690.

"The statute recognizes the fact that it is no proper business of a common carrier to foster any particular enterprises or to build up new industries, but, deriving its franchise from the legislature and depending upon the will of the people for its very existence, it is bound to deal fairly with the public, to extend them reasonable facilities for the transportation of their persons and property, and to put all of its patrons upon an absolute equality." *Schofield* v. *Railway Co.,* 43 Ohio St., 571; *Sanford* v. *Railway Co.,* 24 Penn. St., 378; *Messenger* v. *Pennsylvania R. R. Union* (36 N. J. Law), 407; *McDuffy* v. *Portland, etc., R. R. Co.,* 52 N. H., 430; *Interstate Com.*

v. *Midland Railway Co.,* 168 U. S., 173.    See the unlawful rates: 8 I. C. C.; *C., M. & St. P. Ry.* v. *Tompkins,* 174 U. S., 10, 167 (44 L. ed., 417); *Minneapolis* v. *Minnesota,* 186 U. S. (1901), 268, and 181 U. S., 100; *Regan* v. *Trust Co.,* 154 U. S., 400.

Statutes on this subject aid rather than supplant the common law against unlawful discriminations.    *Tift* v. *South. Ry. Co.,* 123 Fed. Rep., 789.

Rates on the whole system will be revised, if necessary, to prevent discrimination against local points.    90 Iowa, 594; 82 Iowa, 312; 31 Am. St. Rep., 477; 45 Am. & Eng. R. R. Cas., 391.

Where two or more railroads promulgate and practice a rule, with reference to a particular kind of traffic, that subjects shippers to an unjust and an unreasonable prejudice and disadvantage, and gives the carriers an undue and unreasonable preference and advantage, the question is one of *fact.*    An order of the commission based upon the finding of such *fact* is *prima facie* a lawful order.    Interst. Com. Com., 123 Fed. Rep., 597.

Meridian once had a satisfactory rate from St. Louis over the Mobile & Ohio by reason of the cheap rate offered by appellant because of its open connection with the Mississippi river at Vicksburg, but after securing traffic it consolidated with the Vicksburg, Shreveport & Pacific, and most likely with the Mobile & Ohio, and at once deprived Meridian of the benefits of former competition with the Mobile & Ohio.    Mr. Harvey claims that his road was greatly benefited by its traffic arrangement with the Vicksburg, Shreveport & Pacific.    Meridian says that it ruined her.    This discrimination was to further the appellant's own interest, and it is unlawful.    *Rice* v. *West. N. Y. P. R. Co.,* 4 Interst. Com. Com., 131.

The rebilling, as conducted by the appellant and the Vicksburg, Shreveport & Pacific, was a bare subterfuge.    The grain consigned to Vicksburg over the Vicksburg, Shreveport & Pacific, subject to call or order of the appellant, was interstate

commerce until it landed in the warehouses or elevators at Vicksburg, but at that moment it became local commerce and subject to operation of the laws of this state. The scheme for forwarding, as it might be sold to points in this state, was a fraud devised to evade the laws of this state. The court should not lend its approval to such practice. *South. Ry. Co.* v. *Haymann,* 45 S. E. Rep., 491 (Ga.).

The commission was compelled to undertake to do what Mr. Harvey swears cannot be done—to wit, to segregate as far as possible the earnings and expenses in local commerce from the earnings and expenses in interstate commerce. When the appellant has failed to furnish to the commission data peculiarly within its own knowledge as to the amount of earnings from state business and the amount of expenses for doing state business, as distinguished from interstate earnings and expenses thus incurred, it is not in position to criticise, or even object to, what the commission honestly does in that respect.

It was in such practical, common-sense view that the legislature by sec. 4290 of the code directed their consideration. So, if counsel's contention be true, that there is such a disproportion between the earnings on state and interstate traffic as to cast the burden on the latter, then does not the blame stand at the door of the appellant? Has it not all along had an opportunity to correct the evil? Ought it not to be virtuous before demanding that the commission shall be above suspicion? Should not the appellant ask a revision of all its rates or show all earnings to settle its proposition of bankruptcy rather than exhaust itself upon a single commodity? Is it the purpose of appellant to compel Meridian people to build warehouses at Vicksburg and have their grain shipped there, and not rebilled at 3½ cents as the Vicksburg, Shreveport & Pacific does, but reshipped at 10 cents? It is not the correct test to say that the commodity that rests at a point an indefinite period is no longer interstate. The true test is what its destination is when it begins its journey at the initial point.

It is difficult to understand precisely the real complaint of the appellant. Its bill, and much of its testimony, indicates that one of the principal contentions is to the effect that, even if the commission rate is reasonable, it ought not to be enforced, because the commission has permitted the Meridian board of trade to make a tool of it; another, that the purpose is to reach the Mobile & Ohio—to victimize appellant; still another, that the rebilling rate is robbery—held up under menace; another, it has not a sufficient number of cars to do a fair business, and, therefore, should be allowed to oppress. It is specific and quarrelsome on every possible proposition, except the test questions—the value of the road; the expenses, local and interstate separated; amount of receipts, local and interstate separated. These questions answered, a fair return could quickly be ascertained. Until the appellant disgorges on all these points, it has no business in a court of equity.

*Jno. D. McInnis, Jr.,* on the same side.

The finding of the court below should be affirmed:

I. Because the rate as fixed by the commission is, *prima facie,* just, reasonable, and valid. 4 Thompson on Corporations, 4267.

Any doubt is to be resolved in favor of the rate. *Mo. Pac. R. R. Co.* v. *T. Pac. R. R. Co.* (C. C.); 31 Am. & Eng. R. R. Cas., 76.

And all evidence comparing rates in other states with this rate is incompetent until circumstances and conditions be shown. 1 Greenleaf (16th ed.), 14.

Evidence of division of freights between the appellant and the N. O. & N. E. R. R. is incompetent. *Lamkin* v. *Railroad,* 78 Miss., 502.

The finding of the commission is entitled to more weight than an ordinary presumption. *Adams Express Co.* v. *Ohio St. Auditor,* 165 U. S., 229, cited and followed in *Railroad* v. *Adams,* 77 Miss., 764, 778.

II. Because the rate as fixed by the commission is not unreasonably discriminative in favor of Meridian and unreasonably discriminative against intermediate stations.

(a) Because the volume of traffic into Meridian is greater than that into intermediate stations. *Richardson* v. *Midland R. Co.*, 4 Nev. & Mac., 1; *Smythe* v. *Ames*, 169 U. S., 466 (42 L. ed., 819).

One can sell cheaper at wholesale than at retail. *Inter. Com. Com.* v. *B. & O. R. R. Co.*, 145 U. S., 263; *Boston Chamber of Commerce* v. *L. S. & M. S. R. Co.* (I. C. C.), 32 Am. & Eng. R. R. Cas., 618; *Covington & L. Transportation Co.* (Ky.), 20 S. W., 1031.

(b) Because Meridian is a competitive point and the intermediate stations non-competitive points.

Meridian is a competitive point. *In re L. & N. R. R. Co. et al.*, 29 Am. & Eng. R. R. Cas., 16; *Aberdeen Group Ass'n* v. *M. & O. R. R. Co.*, 620 I. C. C. (June 25, 1904).

Competition warrants reduction and lower rates. *Ex parte Koehler*, 21 Am. & Eng. R. R. Cas., 58, 60; *In re L. & N. R. R. et al., supra.*

While there may not be discrimination between persons, there may be discrimination between places. *Ex parte Koehler, supra.*

Freight carried to and from competitive points is always carried under dissimilar circumstances and conditions from that carried to and from non-competitive points. *Ex parte Koehler, supra; Attorney-General* v. *B. & D. J. R. Co.*, 2 Am. & Eng. R. R. Cas., 124.

III. Because the rate as fixed by the commission is not a regulation of interstate commerce, but a valid exercise of the power to regulate rates inherent in the legislature and conferred by the legislature upon the railroad commission.

When a pilot boards a vessel he becomes, for the time being, its master; yet a law passed by the legislature of Pennsylvania, controlling pilots, was held valid, though that law affected pilots

on vessels coming from foreign ports. "We are of the opinion that this law was enacted by virtue of the power inherent in the state to legislate; that it is not in conflict with any law of congress; that it does not interfere with any system which congress has established by making regulations or by intentionally leaving individuals to their own unrestricted actions; that this law is therefore valid." *Cooley* v. *Board of Wardens,* U. S., 13 L. ed., 296, 319.

The legislature of Delaware authorized the plaintiff to construct a dam across a creek lying wholly within that state. The defendant's sloop, registered under the laws of the United States, struck and injured the dam. In the suit that followed, the defendant filed a plea setting up that the creek was a navigable one, in which the tides flowed and reflowed. A demurrer to this plea was sustained in the state courts; and on appeal to the United States supreme court that court say:

"The measure authorized by this act stops a navigable creek and must be supposed to abridge the rights of those who have been accustomed to use it. But the abridgment, unless it comes in conflict with the constitution of the United States, is an affair between the government of Delaware and its citizens, and of which this court can take no cognizance." *Wilson* v. *Creek Co.,* 2 Pet., 250; cited and followed in *Gilman* v. *Philadelphia,* 3 Wall., 713 (18 L. ed., 100).

"The warehouses of these plaintiffs in error are situated, and their business carried on exclusively, within the state of Illinois. They are used as instruments by those engaged in state as well as interstate commerce, but they are no more a necessary part of interstate commerce than the dray or cart, which, but for them, grain would be transported from one railroad station to another. Incidentally they may become connected with interstate commerce, but not necessarily so; their regulation is a thing of domestic concern, and certainly until congress acts in reference to their interstate relations, the state may exercise all the power of government over them, even though in so doing

it may indirectly operate upon commerce outside its immediate jurisdiction." *Munn* v. *Illinois*, 94 U. S., 113 (24 L. ed., 77).

Transportation from point to point entirely within a state is subject to state control, and no more subject to national control than a railroad in Canada. *C., B. & Q'. R. Co.* v. *Cutts*, 94 U. S., 187 (24 L. ed., 95); *C. B. & Q. R. Co.* v. *Jones* (Ill.), 24 L. R. A., 141; *L., N. O. & T. P. R. Co.* v. *State*, 66 Miss., 662, 675; *Railroad Commission* v. *Railroad*, 78 Miss., 751; *In re L. & N. R. R. Co. et al.* (I. C. C.), 29 Am. & Eng. R. R. Cas., 16; *Lehigh Valley R. Co.* v. *Pennsylvania*, 145 U. S., 192; *Seawell* v. *K. C., F. S. & M. R. Co.*, 119 Mo., 222; *Stone* v. *Farmers' Loan & T. Co.*, 116 U. S., 330; *B. & O. R. Co.* v. *Maryland*, 21 Wall., 456 (22 L. ed., 678).

"The contract of shipment of wheat from West Union, Iowa, to Milwaukee, Wisconsin, providing that the responsibility of the company receiving the grain should cease with the delivery thereof at Postville, Iowa, to the connecting line, is a contract wholly to be performed within this state (Iowa), and not open to the objection that it relates to commerce between the states, and therefore not within the scope of our statutes." *Heiserman* v. *C., B. R. & N. R. R. Co.* (La.), 16 Am. & Eng. R. R. Cas., 46.

IV. Because the rate on grain and grain products now prevailing is unjust and unreasonable and gives undue preference to the Vicksburg, Shreveport & Pacific Railway and to the shippers of Vicksburg.

The defendant has no right to make any unjust and unreasonable discrimination. But what are such discriminations? No rule can be formulated with sufficient flexibility to apply to every case that may arise. It may, however, be said that it is only when discrimination inures to the undue advantage of one man in consequence of some injustice inflicted on another that the law intervenes for the protection of the latter. *Hays* v. *Pennsylvania R. R. Co.*, 12 Fed. Rep., 309.

Charges must not only be reasonable, but reasonable when

the circumstances and conditions are the same.  Privileges tending to give a shipper a monopoly which may injuriously affect those engaged in a like pursuit are declared to be unjust. *Hoover* v. *Penn. R. R. Co.* (Pa.), 61 Am. & Eng. R. R. Cas., 106; *Bayles* v. *Kas. Pac. R. R. Co.* (Colo.), 40 Am. & Eng. R. R. Cas., 42, 47.

The plaintiffs were engaged as common carriers by means of steamboats between Decatur and Bridgeport on the Tennessee river.  A rival line of boats plied between the same points. Both lines bore the same relation to the defendant railroad company, each seeking its services to carry their freight to the same point of destination.  In the matter of freight delivered to them by the rival line, the railroad company charged and received from the plaintiffs 50 cents more per 100 pounds than it charged and received from the rival line.  For this systematic discrimination plaintiffs seek to recover damages.  It was decided:

1. That they were entitled to recover.

2. That the fact that the rate charged the plaintiff was not unreasonable does not affect the fact of discrimination.

3. That the relative situation of the two rival lines of boats on the river being the same as to the defendant company, both as to the kind of service and the conditions under which it is to be performed, no charge is reasonable for one party that is not reasonable for the other.  *Samuels et al.* v. *L. & N. R. R. Co.* (C. C.), 30 Am. & Eng. R. R. Cas., 79.

The fact that a railroad company charges a local shipper more for transporting property between two points on its line than it charges for the same haul when the property is received from a connecting line, and is carried under a joint tariff established by the connecting carriers, is sufficient evidence to establish the charge of undue preference or discrimination.  *Parsons* v. *C. & N. W. R. R. Co.*, 63 Fed. Rep., 903; *Parsons* v. *T. P. R. R. Co.*, 57 Fed Rep., 948; *Tozer* v. *United States*, 52 Fed. Rep., 917.

The railroad was hauling oil at a lower rate for the Standard

Oil Company than it was for the plaintiffs, and it based the justice of this discrimination, among other things, upon

1. That they could not afford to carry for the plaintiffs at as low rates as they were carrying for the Standard.

2. That unless they made this lower rate to the Standard, they would not get the Standard's business.  It was decided:

That where a lower rate is given by such a corporation to a favored shipper, which is intended to give, and necessarily gives, an exclusive monopoly to the favored shipper, affecting the business and destroying the trade of the other shipper, the latter have a right to require an equal rate for all under like circumstances. *Schofield et al. v. L. S. & M. S. R. Co.,* 43 Ohio St., 571 (23 Am. & Eng. R. R. Cas., 612).  (For careful review and magnificent criticism of this case, see Miss Tarbell's article in June number, 1903, *McClure's Magazine.*)

"In the matter of the intervening petition of the Vicksburg, Shreveport & Pacific Railway Company and Frank S. Bond, receiver of the Vicksburg & Meridian Railway Company, the petitioners allege that they are operating a connecting railway line of the Texas Pacific lines, and the gist of their complaint, as a basis of relief, is that the receivers of the Texas Pacific have been, and are, discriminating against the lines operated by petitioners by requiring and receiving from them a higher rate for the carriage of all classes of freight both east and west bound over said lines, of which they are, and have been, receivers, than said receivers have required or received of other railroad companies and transportation lines, particularly the Missouri Pacific Railroad Company and the St. Louis, Iron Mountain & Southern Railroad Company, for similar services and similar carriage of like freight.

"In their answer in this suit the respondents say: 'That they (respondents) further show that the amount of business contributed by the Missouri Pacific lines to the Texas Pacific lines is immensely greater than that to and from the lines of petitioners. . . . Further, respondents show that the petition-

ers' lines are not able to furnish any such amount of business or advantageous interchange of traffic as the Missouri Pacific lines. . . . They aver that whenever petitioners in this proceeding are ready to tender them the same amount of business and the same advantages of interchange, under the same conditions as the Missouri Pacific, they believe they will be ready to make with them an arrangement similar to that made with the said Missouri Pacific.' "

Say the court:

"It is contended by the petitioners that this contract (between the Texas Pacific and the Missouri Pacific) itself shows a preference in rates, business, and facilities to do business on the part of the receivers of the Texas Pacific in favor of the Missouri Pacific system and against all other connecting lines. This contention seems to be well founded. A preference in rates and business in favor of one connecting line is a discrimination against other connecting lines."

"If respondents are, as they seem to say, charging the petitioners' line less per ton per mile than the charges made on respondents' lines to other shippers under the like circumstances and conditions as to distance and shipping points, then respondents are discriminating (and probably against shippers that are forced to use their lines), which ought not to be permitted under any circumstances, and particularly on a railroad to the construction of which the general government and the state of Texas contributed so largely a portion of the public lands." *Missouri Pacific R. R. Co.* v. *Texas Pacific R. R. Co.* (U. S. C. C.), 26 Am. & Eng. R. R. Cas., 1.

It will be observed that the petitioners in the above case were fighting against indentically the same arrangement their successors are fighting for in the case at bar.

*Alexander & Alexander,* and *George B. Power,* on the same side.

Appellant has treated this case throughout from a view point different from that of the appellee and of the court below.

The commission was not acting under Code 1892, § 4290, which gives the general power to revise tariffs submitted by the company, but under sec. 4297, which requires the commission to hear complaints of any rate on the ground of unjust discrimination, and to make any change deemed proper and require compliance with its order. This view narrows the scope of the inquiry and eliminates many questions discussed by appellant. For instance, it eliminates the question of the constitutionality of that part of sec. 4290 which requires the commission, in revising tariffs, to consider the entire business of the railroad. The commission was not called on to fix, in the first instance, a tariff or to judge as to the reasonableness of one submitted to it. Whatever may be the construction of sec. 4290 as to the constitutionality of considering interstate earnings in revising rates, it cannot be doubted that the commission has power under sec. 4297 to compel a railroad company, which has put in a rate and submitted it and had it approved, to extend it to all alike. For instance, the commission may not have the power to compel a company to put on an extra train, but if such train is being run, it can compel the company to carry all on it at the same terms.

Instead of the order fixing a general tariff on grain products, it does not even prescribe a local rate graduated according to mileage. The order deals with only *one* commodity, from only *one* point to only *one* point, and shipped in only *one* way. It deals with grain products shipped from terminal to terminal in car-load lots. The local rate of 10 cents was not arbitrarily cut down to $3\frac{1}{2}$ cents. The local tariff remains unaffected, but it is prohibitive according to the testimony of the president of the railroad himself. He admits that it was never available for transportation of grain products from Vicksburg to Meridian. Not one pound of grain was carried on it or ever will be; yet one-fifth of all the freight receipts of the whole company on its entire line comes from shipments of grain products from Vicksburg. All of this grain, or nearly all, is carried on the

so-called "rebilling" rate. This rate was voluntarily put in by the company and allowed by the commission, and is being maintained now by the company. The commission merely says to the company that, since you are carrying all of your grain from Vicksburg to Meridian at $3\frac{1}{2}$ cents, and since you give this rate to Vicksburg dealers, you must make it general. The 10-cent rate being prohibitive, the company made its own rates. It first made a rate from Texas to Meridian of the Vicksburg rate plus $2\frac{1}{2}$ cents. From March 7, 1900, to December 12, 1901, the rebilling rate was $3\frac{1}{2}$ cents, and it is not even claimed that this was not voluntary. This rate was raised in December, 1901, to 5 cents, but in July, 1902, was restored to $3\frac{1}{2}$ cents. The claim that this rate was put in under fear of adverse action by the commission is unfounded. There is no evidence to support it. The company never asked for relief against it. Indeed, it has extended it until it is not a rebilling rate at all. It is, in every essential feature, an open rate. The order, if enforced, would not prejudice the company; it would not lose a dollar.

The practical application of this so-called rebilling rate has been to abolish rebilling proper and substitute for it shipments directly out of warehouses and from barges at Vicksburg at $3\frac{1}{2}$ cents. If this rate had been confined to rebilling proper, this controversy would never have arisen; but the appellee adopted the practice of giving expense bills or freight receipts for all incoming grain over the Vicksburg, Shreveport & Pacific into Vicksburg, and making this available in the hands of any one for ninety days on shipments out of Vicksburg to Meridian for a like amount of grain products wherever procured or wherever kept. The result was that these expense bills were always on hand to the amount of all the grain sold locally in Vicksburg or sold and shipped out by the Yazoo & Mississippi Valley or by the river. They were never used on through shipments proper, for they were never needed. Shippers are given receipts solely to be used in shipping out grain from ware-

houses and barges. Being transferable and far in excess of the need for their use, they are always availed of in lieu of shipments by local rates. Thus the company has made the rebilling rate an open rate, and the commission has merely pointed out to the public the nature of the transaction, and given to it what the company is already giving to a favored class.

. The legality of these practices has been several times considered by the interstate commerce commission, and the rebilling rates, as here used, denounced as fictitious and as being in reality local rates. See *Chicago & A. R. R. Co.* v. *Chicago, etc., R. R. Co.,* 2 Interst. Com. Rep., 721 (7 *Ib.,* 240; 9 *Ib.,* 373). This last case is also interesting as showing the illegality of giving a special rate where freight is received in large quantities. Here the special rate is given to shippers over the Vicksburg, Shreveport & Pacific.

The Vicksburg dealer is welcome to all the advantages which locality on the river or his own enterprise gives him. The complaint here is that the company discriminates in his favor. "A," who received a car of grain into Vicksburg by the Vicksburg, Shreveport & Pacific, and has consumed or sold it there, can, within ninety days, take from a barge or from his warehouse river grain or Yazoo & Mississippi Valley grain and ship it to Meridian at $3\frac{1}{2}$ cents, while "B," who brings grain to Vicksburg by barge or by the Yazoo & Mississippi Valley, or who buys it in Vicksburg, must pay 10 cents for the same haul.

The giving of this rebilling privilege to those only who have patronized the Vicksburg, Shreveport & Pacific is a gross discrimination. It is denounced in the severest language by the decisions. *See Hayes* v. *Penn. R. R. Co.,* 12 Fed. Rep., 309, and note; *Samuels* v. *L. & N. R. R. Co.,* 31 *Ib.,* 57.

The purpose of all railroad commissions is twofold—first, to prevent discrimination; and second, to regulate rates. As stated by Judge Brewer in *Wright* v. *U. S.,* 167 U. S., 578, such statutes are intended "to enforce equality between ship-

pers and to prohibit any rebate or device by which two shippers shipping over the same line, the same distance, under the same circumstances or carriage, are compelled to pay different prices therefor." This case holds it an unlawful discrimination to give a special rate to one because he has a warehouse and switch on a competing line. And to meet that advantage, a railroad cannot discriminate in favor of a shipper who ships a large amount of freight over another in the same business, at least where both ship in car-load lots. *Louisville, etc., R. R. Co.* v. *Wilson,* L. R. A., 105, and note.

It is clearly discrimination to give the rebilling privilege only to those who have brought their grain by a favored line. *Toledo R. R. Co.* v. *Penn. R. R. Co.,* 19 L. R. A., 395.

It is discrimination to charge one connecting carrier more than another, and the fact that the higher rate is not unreasonable is immaterial. *Samuels* v. *L. & N. R. R. Co.,* 31 Fed. Rep., 57.

While we insist that the reasonableness of the rate is not involved, yet if we are mistaken in this, we say that the company failed to show that the rate was unreasonable. ·

The rate being *prima facie* reasonable, the burden is on the railroad company to show that it is unreasonable. The very fact that the company has been for years carrying all the grain it handles from Vicksburg to Meridian at 3½ cents is conclusive evidence that it is deemed by the company reasonable. The president of the company does not claim that the rate ought to be more than 5 cents per 100 pounds. He testifies that that would yield a fair profit. The appellant, together with the Vicksburg, Shreveport & Pacific, for a long time maintained a rate of 2½ cents from Vicksburg to Meridian on Texas grain, although appellant's share of the freight was more than that. The haul being over the entire line, from terminal to terminal, and in car-load lots, is at a minimum of expense. The shipments are local only in the sense of being entirely within the state; in fact, they are through shipments, since they go over

the entire line of appellant. It could well afford to carry such grain as at the interstate rate, since it is at no more expense. Vicksburg, in fact, originates no grain; hence there are no shipments involved, except those that are through shipments proper and those which go out under this rebilling rate. It is idle to talk about discriminating against home-grown corn, since there is none moving out of Vicksburg.

It is uniformly held that the commission, being presumably composed of business men, conversant with local conditions, can judge as to the reasonableness of rates better than courts. *Chicago, etc., R. R. Co.* v. *Tompkins,* 176 U. S., 172 (73 Fed. Rep., 409).

Before a particular rate can be shown to be so unreasonable as to be a deprivation of property without due process of law, the company must show the value of the railroad and its equipment. The cost of the road is not the criterion of its value, nor is the amount of the outstanding stock and bonds. *L. & N. R. R. Co.* v. *Brown,* 123 Fed. Rep., 946. Returns made by the company for taxation are competent and of great value. *Ib.* As to the proper method of valuing railroad property, see report of interstate commerce commission for 1903, p. 30.

We deny that the commission based the rate on the interstate earnings of the company. While the case of *Smythe* v. *Ames,* relied on by appellant, holds that it is not competent for a state commission to fix domestic rates on the *basis* of interstate earnings, yet it has never been held that the total value of a railroad and its total business of all kinds cannot be *considered* in determining the reasonableness of a given rate. This is made clear and the meaning of *Smythe* v. *Ames* made plain in *Minneapolis R. R. Co.* v. *Minnesota,* 186 U. S., 257, where the court says: "We do not think it beyond the power of the state commission to reduce the freight upon a particular article, provided the companies are able to earn a fair profit *upon their entire business."*

But if we grant the rule as claimed, still it is necessary for

appellant to show the cost of doing its local business. This it failed to do. Its president and auditor testified that they had no data for showing such costs. See *Atlantic Co.* v. *U. S.*, 76 Fed. Rep., 190. The presumption of reasonableness can be overcome only by proof of expenses and receipts during an adequate period. *Ib.*

Evidence that the rates are lower than those to other points or on other roads is not competent. Conditions may be different. 120 Fed. Rep., 934.

The case must be a clear one to warrant interfering with a rate fixed by the commission. *Chicago* v. *Tompkins, supra;* 23 Am. & Eng. Ency. Law, 657; 29 Fla., 617; 25 Fla., 310. If it is impossible to ascertain the cost of interstate business as to receipts from interstate traffic, how can it be said that the commission took this into consideration? There is no evidence on this point before the commission, and there is none before the court.

The computation made by the president of the appellant company, showing that the use of this rate causes a loss, is fallacious. In the computation dividends on stock were computed as fixed charges. This is erroneous. 83 N. W. Rep., 60; *Chicago, etc., R. R. Co.* v. *Day,* 1 L. R. A., 746. His theory is bad and his arithmetic faulty. He gets the expenses per mile by dividing the total freight expenses for a year by the total tonnage for the year, and claims that the quotient represents the cost per ton *per mile.* Obviously the quotient represents the cost of hauling each ton regardless of mileage. This quotient is 91 cents, and is the average cost of moving each ton. If this, then, be the average, considering all shipments of every kind of commodity regardless of distance, surely 70 cents, which he admits he receives per ton on grain, is a reasonable sum for a through shipment from terminal to terminal, without switching or unloading charges, and when the empty cars are left at Meridian, where they are needed most.

If a rate is shown to yield any compensation at all, the court will not interfere. See opinion of Brewer, J., in *Chicago, etc., v. Day, supra.* It is shown that the company earns enough to pay the interest on its bonds and handsome dividends on stock, and a large surplus in addition every year, and this notwithstanding the stock and bonds amount to $3,240,100. If computed on its entire property given in for taxation—namely, $1,290,000—it can be seen that the earnings of the company are almost without precedent. The argument that the company can afford the present rate because it enables it to get freight cars over the Vicksburg, Shreveport & Pacific is disproved by its testimony; but, if true, that would not justify discrimination against private shippers.

We have not discussed the question of Meridian being a basing or competitive point. It is treated as such by the company, and it is recognized by the interstate commerce commission. But this is not a freight classification; it is the curing of a discrimination by requiring a rate, given to a class of people who control practically all of the shipments of grain over the road from Vicksburg to Meridian, to be given to all other shippers.

The question presented is exceedingly important to the public. It is of little importance to appellant, for it is admitted that if the rate had been put in it would have diminished the company's revenue only to the extent of $1,495. The vital question is whether the state railroad commission is to be shorn of its power to compel a rate, adopted by a domestic railroad, between points in this state, and granted to a part of the public, to be extended to the whole of the public. The existence of the Mississippi river is an advantage to Vicksburg of which no one seeks to deprive it. The commission has not sought to take away from that city the advantage of river competition for rates on freight coming *into* Vicksburg, but does say that no one shall be given a lower or privileged rate *out of* Vicks-

burg over one of the railroads leading into Meridian, and with which neither the river nor the Vicksburg, Shreveport & Pacific competes.

Argued orally by *T. A. McWillie,* for appellant, and by *C. H. Alexander, Monroe McClurg,* and *John D. McInnis, Jr.,* for appellee.

TRULY, J., delivered the opinion of the court.

Many important questions are pressed on our consideration which, in view of our conclusion, we have found it unnecessary to discuss or decide.

The facts which are decisive of this controversy are very few, and a statement of them eliminates from consideration many of the more difficult questions urged by counsel. On December 13, 1902, the board of trade of Meridian presented to the railroad commission of Mississippi a petition praying that the proportionate rate of three and one-half cents then in effect from Vicksburg to Meridian be made an open rate, subject to use of all shippers from Vicksburg. The rate referred to in the petition was a rate on grain and grain products handled in car-load lots. This class of freight, under the guise of a "re-billing rate," was transported from Vicksburg to Meridian at the rate of three and one-half cents per hundredweight.

After full investigation, the railroad commission, on November 16, 1903, passed an order directing the Alabama & Vicksburg Railway Company "to put in effect over its line of road from Vicksburg, Mississippi, to Meridian, Mississippi, inclusive of both of said cities, from and after December 8, 1903, a flat rate of three and one-half cents per hundred pounds on grain and grain products, and no more;" the general terms of this order being limited, however, to grain and grain products handled in car-load lots, this being the extent of the prayer of the petition filed with the commission. Against the enforcement of this order the appellant procured an injunction. On

final hearing on bill, answer, exhibits, and proofs, the injunction was dissolved, and a decree rendered dismissing the bill of complaint, and from that decree this appeal is prosecuted.

In reviewing the action of the railroad commission in promulgating the order in question, it is necessary, to determine the justice and correctness of their action and their power and authority in the premises, to note the exact condition of affairs as they existed at and before the filing of the petition by the Meridian board of trade. Vicksburg and Meridian, one hundred and forty miles distant one from the other, are the termini of the Alabama & Vicksburg Railway. Vicksburg, situated on the Mississippi river, has the advantage of both railroad and river competition; Meridian is a railroad center of considerable importance. In both cities there are many jobbers and wholesale dealers handling grain and grain products in large quantities, and doing an extensive business, both locally, by wagon trade, and over the railroads, with adjacent towns. The authorized all-rail interstate rate on grain and grain products in car-load lots from the chief market in the west to Vicksburg is twelve cents, to Meridian is fourteen cents. On account of the material advantage due to river competition, Vicksburg handles a portion of its business in grain and grain products by barge, and gets the cheaper rate incident to water transportation during some seasons of the year, the minimum river or barge rate being admittedly lower than the all-rail rate. In July, 1902, the Alabama & Vicksburg Railway Company put into effect a so-called "rebilling" rate of three and one-half cents per one hundred pounds on grain and grain products, effective from Vicksburg to Meridian. A true rebilling rate is one in which goods received in unbroken car-load lots over one line of railway can be rebilled over the same or another line, completing one continuous trip of the same commodity, simply changing the consignee and altering the destination of the identical shipment, without unloading or handling of freight. What is denominated a "rebill-

ing rate" in this record does not, as actually employed, comply with the definition above given in several most important particulars. In the first place, the rate is not applied to consignments arriving over all connecting lines, but is only available to those receiving freight over the Vicksburg, Shreveport & Pacific Railway. In the second place, the freight reconsigned over the Alabama & Vicksburg Railway line did not complete one continuous trip, without handling or unloading, and was not necessarily, or even generally, the identical shipment which was originally consigned to the merchant in Vicksburg; the custom being that dealers in Vicksburg handling freight over the Vicksburg, Shreveport & Pacific Railway could save their "expense bills" (or receipts showing the amount of freight which they had received over that line), and be granted the privilege, within ninety days from date of such receipts, of shipping freight of an equal quantity over the line of the appellant at the "rebilling" rate of three and one-half cents per hundredweight. Thus, a merchant receiving a car load of oats over the Vicksburg, Shreveport & Pacific Railway could, within ninety days of that date, ship over appellant's line a car load of corn or other grain product without regard to the source from which it was procured. The result of this was that the merchant in Vicksburg who patronized the Vicksburg, Shreveport & Pacific Railway Company could receive any amount of grain product by barge or otherwise, and keep it stored in his warehouse, with the full assurance that he could, at any time within the period stated, have the advantage of this cheap rate over appellant's line, whereas the merchant not dealing with this specially favored "associated line" was denied the same rate; the only condition precedent to the enjoyment of the rebilling rate being that the consignor must first have received an equal quantity of freight over the line of the Vicksburg, Shreveport & Pacific Railway. The effect of this custom was, as developed by the uncontradicted evidence, that, while the Vicksburg dealer could not deliver grain products at the

city of Meridian any cheaper than could the Meridian dealer, he could undersell and make prompter delivery in the towns adjacent to Meridian and by natural location within its territory, being able, by operation of this arrangement, to reach Laurel or Hattiesburg three cents per hundredweight cheaper than could the Meridian dealer. So a dealer in Vicksburg, receiving a barge of corn by river, could ship it, under the guise of rebilling, over appellant's road at three and one-half cents per one hundred pounds, while the Meridian dealer, who might also receive a barge of corn at Vicksburg, could only ship over the appellant's road by paying the prohibitive local rate of ten cents per one hundred pounds. This statement, brief as it is, is sufficient to demonstrate that the practical working of the so-called "rebilling rate" was to give a very great advantage to those receiving freight over the Vicksburg, Shreveport & Pacific Railway and to unjustly discriminate against all but this specially favored class; the result being that the Vicksburg dealer could with impunity invade the territory adjacent to Meridian, and undersell its dealers at points more distant from Vicksburg, and to reach which it was necessary to pass through Meridian. That this was the inevitable result of the arrangement in question is practically confessed by the appellant, but the force of the admission is sought to be avoided in two ways: First, it is said that the establishing of the rebilling rate was not a voluntary act on the part of the appellant, but that the plan was inaugurated under compulsion by reason of the "threat" and "menace" of the railroad commission to put into effect a flat rate of three and one-half cents if appellant declined to adopt the rebilling arrangement herein referred to; that the appellant, while realizing that the rate was unreasonably low, deemed it wiser to endure that ill rather than face other evils which it apprehended might be inflicted by the railroad commission. While this is the distinct statement of the witnesses for appellant, we are constrained to hold, in the absence of record proof showing

any official action by the railroad commission, that the putting in force of the rebilling rate in question was a voluntary act of the appellant. We are strengthened in this view by the uncontroverted statement in the record that, at periods prior to the establishing of the present arrangement, other rates had been in force under which the appellant received no more for its services than it would under a uniform flat rate of three and one-half cents. Again, we do not recognize it as a possibility under any contingency that the railroad commission of Mississippi would or need employ threat or menace to protect the rights of the public from the aggression or extortion of corporations. We rebuke the intimation as an unwarranted aspersion of the railroad commission. A state tribunal charged with the duty of exercising "a watchful and careful supervision over the tariffs of charges of every railroad," and of revising "the same from time to time as justice to the public and the railroad may require," is clothed by law with necessary power to achieve the purposes of its existence, without resorting to menace or threat to extort from any corporation subject to its lawful supervision an unreasonable reduction of rates. Nor do we admit that the necessity can ever exist for appellant or any other corporation to submit to unjust or unauthorized regulations by the railroad commission of Mississippi, when the courts of the land stand ever open, able, and willing to protect them from any oppressive action. If in fact it be true that the so-called "rebilling rate" establishes an unreasonably low compensation for the transportation of grain and grain products, and the same was inaugurated by order of the commission, then the appellant had a complete and adequate remedy by contesting in a legal way the reasonableness of the rate and the power of the railroad commission to enforce it. We express no opinion, because not involved necessarily in the determination of this particular suit, as to whether the railroad commission would have had the authority to establish in the first instance the rebilling arrangement now in force. This record

does not show that the rate was established in pursuance of any official order or action on the part of the railroad commission. We deal with facts as we find them.

In the next place, it is urged by the appellant that the rebilling arrangement operates uniformly as to all shippers occupying similar positions; that, if discrimination results, it is not on account of the rate itself, but because of differences in the natural advantages incident to location which one shipper has over another. It is insisted that the appellant denies to no one, who will comply with its conditions, the right to avail himself to the fullest extent of the advantage of the same rate which is granted to other dealers; that if the Meridian dealer will receive freight over the Vicksburg, Shreveport & Pacific Railway consigned to him at Vicksburg, he can thereafter, within ninety days, also rebill freight to an equal amount over appellant's line at the same rate given the Vicksburg dealer. And this, it is urged, is a granting of the same privileges to all, and that therefore appellant is not guilty of unjustly discriminating against one, or unfairly favoring another, class of shippers. But the condition prerequisite to the enjoyment of the rebilling rate is, in and of itself, a discrimination. No one is granted the rate who has not first received an equal amount of freight over the Vicksburg, Shreveport & Pacific Railway and who can produce "expense bills" paid within ninety days of the proposed shipment; the necessary result being that the Meridian dealer, having no means of disposing of the freight arriving over the Vicksburg, Shreveport & Pacific Railway, cannot accumulate the "expense bills" demanded. Hence such shipper can only rebill the identical commodity and car originally consigned to him, which goes forward and completes one continuous journey. This is a "rebilling" in its true meaning, and no one could justly complain if this plan was strictly enforced and uniformly adhered to. But, as hereinbefore pointed out, the plan now in vogue between the appellant and the Vicksburg, Shreveport & Pacific Railway Company does not

operate fairly* or uniformly in this: The Vicksburg dealer, having disposed locally of the original shipments received by him over the Vicksburg, Shreveport & Pacific Railway, presents his accumulated "expense bills," and "rebills" freight received by him by barge or over the Yazoo & Mississippi Valley Railroad, under a rate cheaper than that granted the general public, to points by location naturally tributary commercially to Meridian. The statement of appellant that if the Meridian dealer will comply with certain required conditions he can enjoy the same privileges, while phrased with specious fairness, is in truth but making an offer of which stress of known and insuperable circumstances prevents acceptance or enjoyment. It is simply tantamount to saying that, if he will become a Vicksburg dealer, then he can have the same rate that other dealers so situate enjoy. This is the one thing that makes the operation of the rule a discrimination in favor of a Vicksburg dealer, and the only fact that gives the Meridian dealer the right to complain.

A "rebilling" rate, to receive the sanction of law, must operate uniformly and fairly, and must be open to all alike. It cannot lawfully be restricted to shippers who live in a certain locality and who previously receive freight over a certain other favored associated carrier. This consideration alone furnishes conclusive proof that the plan, in this record, courteously termed a "rebilling arrangement," is, in truth, but a flimsy disguise for a plan which operates to the benefit primarily of the Vicksburg, Shreveport & Pacific Railway Company; secondarily, and perhaps incidentally, to the advantage of the Vicksburg dealer; and ultimately, but inevitably, to the marked damage of the Meridian dealer. In a vague and shadowy way this arrangement is sought to be justified by the officials of the appellant by showing that, in consideration thereof, appellant is granted an extra proportion of freight and certain special privileges as to the use of cars by the Vicksburg, Shreveport & Pacific Railway Company. It is not shown that the same

privileges could not have been obtained from the Yazoo & Mississippi Valley Railroad Company. Nor, except in a most insubstantial manner, is it shown how a car received and unloaded on one day can be utilized in the hauling of another shipment made, perchance, ninety days thereafter, or how it can benefit the appellant, especially in view of the fact that the demand for empty cars must necessarily vary daily according to the pressure of traffic, and it is impossible to foretell what the demand may be at any stated future time. But if these facts be granted, and the moving considerations such as would stand the test as a permissible interstate traffic arrangement, still the incurable vice in the arrangement is in the unfair and discriminatory manner in which it is enforced, and the special privileges enjoyed by one, but from which another class of shippers is debarred.

The practical operation of the plan being thus demonstrated as causing a gross discrimination, the next question presented is whether the state railroad commission was vested with authority to pass the order, the enforcement of which is now assailed, the effect of the order being simply to convert the then existing so-called "rebilling" rate into an open or flat rate, with the result that all dealers handling grain or grain products in car-load lots could enjoy the rate then in force from Vicksburg to Meridian. It will be noted that the rates then in existence were left undisturbed, the only change wrought by the order being to abolish the condition precedent, insisted on by appellant, restricting the rate to the exclusive benefit of such as had received previous and equal shipments over its associated line. The question propounded is easy of solution, in view of the provisions of Code 1892, § 4297. That section authorizes the commission to docket, hear, and determine all complaints made of any tariff of rates, joint or several, made by any railroad or fixed or approved by the commission, on the ground that the charges are for more than just compensation, or that such charges, or any of them, amount to, or operate so as to

effect, unjust discrimination. And when, by regular procedure and full investigation, and after hearing proof, the commission is satisfied of the truth of the statement and the justice of the complaint, it is given express authority to give notice to the railroads concerned of any change deemed proper, and to require compliance with such orders. That is the exact legal status of the order presented to us for review. A tariff or rate had been established by the voluntary action of the railroad company; that tariff operated to work unjust discrimination; complaint was made; the proof fully supports the justice and the truth of the grounds on which the complaint is based; that proof satisfied the chancellor, and it satisfies us, that the so-called "rebilling" arrangement was simply a cloak assumed to conceal an arrangement which, while ostensibly granted as a concession to the Vicksburg dealers, was, in truth, devised for the ulterior purpose of fostering the interests of the Vicksburg, Shreveport & Pacific Railway Company, and perhaps, as it is argued, to maintain present rates to Meridian for the benefit of an associated and connecting railroad at that point. In such state of case the power of the commission to make any change which justice may demand is unquestionably so well established that we deem any citation of authorities, further than a reference to the briefs of counsel, a work of supererogation. It is urged, however, by the appellant that, inasmuch as its intrastate business only yields a certain stated percentage, less than one-half, of its gross revenues, it does not in fact pay the expenses of maintaining and operating its road within the borders of the state, and therefore a reduction of existing rates is an indirect placing of a burden on interstate business, and this is expressly condemned as unlawful by the adjudication of the supreme court of the United States. To this argument it is replied by appellee that it is not shown with any degree of certainty the proportionate amount of the gross operating expenses of the railroad company incurred on account of the intrastate business, but this amount is only arrived at by estimation, and

therefore this court cannot say as a matter of fact, in the absence of positive proof, that the intrastate business of the appellant does result in a net annual loss; and as the findings of the railroad commission are dealt with as being *prima facie* correct, in the absence of direct proof of error this court will affirm its findings of facts.

Again, it is stated by the appellant that the hauling of grain and grain products at a flat or open rate of three and one-half cents per hundred pounds would produce less than the actual cost of transporting the freight, so that the more business of this character the appellant handles, the greater its loss; that this, in effect, is the taking of the property of appellant without due process of law; wherefore the order is void, as being in contravention of the constitution of the United States. To this it is replied that the figures shown in the record do not prove that freight handled in the usual and customary course of business, as freight trains are ordinarily constructed, at the rate established, would result in a loss. Again, it is said, in further answer to this contention, that appellant is only entitled to fix such tariff of charges as will yield a fair compensation for the transportation and handling of freight, and assure that the net profits arising from appellant's entire business, after payment of all operating expenses, will pay a reasonable interest on the value of its property; and, as the real value of the property is not disclosed by the record, the appellant has no ground of complaint on this score, and the court is furnished no definite proof to justify a finding of fact that the owners do not receive reasonable returns from their investment. We decline to enter upon a discussion of either question. Neither is necessarily involved in the decision of this case. It might be conceded that the intrastate business of the railroad results in a net loss, and might further be conceded that the transporting and handling of grain and grain products at the rate established may not in actual operation bring a fair remuneration when limited to that one commodity; nevertheless, the rate

having been established by the voluntary action of the appellant, it must not be so enforced as to operate as an unjust discrimination against any one. If the appellant chooses to establish as to a certain favored class of shippers a rate so low as to be unremunerative, justice demands, and the law will require, that the rate be granted to all alike. "Special privileges to none" is the rule of action by which common carriers must measure their conduct.

*The decree is affirmed.*